# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

OFFICIAL COMMITTEE OF
 UNSECURED CREDITORS, et al.,

       Plaintiffs,        :        Case No. 1:04-cv-066

                                      District Judge Thomas M. Rose
      -vs-                              Chief Magistrate Judge Michael R. Merz
                                :

KAREN L. HENDRICKS, et al.,

       Defendants.

---

**REPORT AND RECOMMENDATIONS ON DEFENDANT DIRECTORS'
MOTION FOR SUMMARY JUDGMENT**

---

This case is before the Court on Motion for Summary Judgment of Defendants Joseph H. Head, Jr., George E. Castrucci, Roger L. Howe, William B. Connell, John H. Gutfreund, and James T. Heffernan (collectively, the "Director Defendants")(Doc. No. 67). Plaintiff has combined its opposition to this Motion with its opposition to the Summary Motion of Defendant Karen Hendricks in one document (Doc. No. 74), and the Director Defendants have filed a reply memorandum in support (Doc. No. 102).

As noted in the Report and Recommendations on Plaintiff's summary judgment motion, although all parties have sought summary judgment in this case, these are not true "cross-motion" for summary judgment. See Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §2720 (1998), on the situation where parties make cross-motions but do not concede the facts are truly undisputed from the opposing party's perspective as well as their own.

## Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;  the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law.  Fed. R. Civ. P. 50).  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id*.  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

2

granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus,

3

in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### Claims Pending Against the Director Defendants

In deciding Defendants' Motions to Dismiss under Fed. R. Civ. P. 12(b)(6), Judge Rose determined that Plaintiff had properly pled in the First Amended Complaint ("FAC")[1] a claim for relief against the Director Defendants for breach of their fiduciary duty of loyalty to Baldwin Piano & Organ. Plaintiff's second and third claims for relief under federal securities law were dismissed and Judge Rose found that Baldwin's Certificate of Incorporation exculpated the Director Defendants from any liability for breach their fiduciary duty of care. (Entry and Order, Doc. No. 9.) Thus the question before the Court on the instant Motion is whether Plaintiff has produced sufficient evidence to sustain a jury verdict against one or more of the Director Defendants for breach of their fiduciary duty of loyalty.

### Factual Background

According to Plaintiff, Baldwin's board of directors hired Defendant Karen L. Hendricks in late 1994 as president and chief executive officer to replace R.S. "Dick" Harrison, who had served

---

[1]The First Amended Complaint is the operative pleading at this point in the case. It was docketed as Doc. No. 22 in the Bankruptcy Court where it was filed August 26, 2002, before this Court adopted electronic filing. The Clerk has now scanned and attached the Bankruptcy Court filings to the docket in this Court (See Doc. Nos. 137, 138, 139). Plaintiff's motion to file a second amended complaint was denied over a year ago. (See Doc. No. 38)

4

in that capacity since leading a management buyout of Baldwin from bankruptcy in the 1980s. (FAC at ¶ 3.)

The Director Defendants were all outside directors (i.e., not employees of Baldwin) and had a good deal of corporate experience with other companies. Defendant Head had previously been a partner in a leading Cincinnati law firm (Graydon, Head, and Ritchey) and was the Chairman of Atkins & Pearce, Inc. See 1999 Proxy Statement, excerpt attached at Exh.2 to the Affidavit of William Connell1 ("Connell Aff."). Defendant Castrucci was an executive officer of Great American Broadcasting and Defendant Connell had served in a similar capacity at Procter & Gamble. *Id*. Defendant Howe had extensive board experience—including positions with Cintas Corporation and Cincinnati Bell—in addition to his own executive experience. *Id.* These directors were joined in 1998 by John Gutfreund, the former CEO and Chairman of leading investment bank Salomon Brothers, and in 2000 by James Heffernan, who served on the boards of United Natural Foods and Columbia Energy Group. See *Id*.

Defendant Hendricks describes -- in her deposition and an Affidavit attached to her own Motion for Summary Judgment – the condition of Baldwin, the challenges it faced in the mid to late '90's, and the efforts made to turn the company around

> When Hendricks joined Baldwin, the Company faced serious competition from Asian piano manufacturers, who were able to produce pianos more efficiently and at a lower cost than Baldwin. (Hendricks Depo. 122:1-6) Baldwin also faced internal obstacles to its success, including outdated manufacturing processes; inadequate infrastructure, such as lacking computer systems; and nonexclusive dealer relationships that allowed Baldwin dealers to sell competing pianos. (Hendricks Affidavit at ¶¶ 4-6.)

> Shortly after Hendricks was hired, Baldwin adopted a five-year strategic plan that was designed to improve the Company's financial performance and, by extension, lead to increased value for shareholders. See Hendricks Depo. at 22:6-17. The plan centered on obtaining substantial growth in Baldwin's three core business—Music (piano manufacturing), Contract Electronics, and Keyboard Acceptance Corp. (piano financing). *Id.* at 23:19-24.

5

>Additionally, Baldwin focused on exiting businesses that were not considered "core" businesses, such as the church organ and contract furniture businesses. *Id.* at p. 24.

>While the Board and Hendricks worked to implement the Company's strategic plan, they were continually confronted with additional external obstacles. Faced with uncertainty from their sole supplier of piano plates, Baldwin decided to build a piano plate factory in Brazil. *Id.* at 164:14-17. And in 1998, the Company faced ramifications from currency devaluations in Asia, which led to steep declines in the price of pianos from Baldwin's competitors in that region. *Id.* at 165:12-166:25.

.

Although the retail financing business was sold in 2000 and the contract electronics division a year later, these sales did not generate enough cash to allow the core piano business to continue and Baldwin filed for Chapter 11 protection on May 31, 2001.

## Positions of the Parties

**The Directors' Motion**

The Director Defendants understand Plaintiff to be asserting two theories of breach of fiduciary duty

>(1) that the Director Defendants ignored warnings and abdicated their oversight authority to favor Baldwin's CEO, Karen Hendricks; and (2) that the Director Defendants violated their duty of disclosure—a subset of the duty of loyalty—through public statements that Plaintiff contends were false. See, e.g., FAC ¶¶ 39(g)-(I).

(Doc. No. 67 at 4.)

The first of these, which the Director Defendants refer to as Plaintiff's "abdication theory," is more specifically pled in the FAC as follows:

>"[T]he Director Defendants had knowledge of gross mismanagement, primarily that of Hendricks," and that despite "having knowledge of such gross mismanagement, the Director Defendants acted, and failed to act, in ways violating established fiduciary duties and causing ever increasing substantial financial damage to the Company, ultimately

6

> leading to insolvency and bankruptcy." FAC, ¶ 38.
>
> [T]he Director Defendants "placed [Hendricks'] personal interests ahead of those of the Company, its shareholders and creditors," and "abdicated their legal obligation to actively supervise management and acted [sic] solely in the best interests of Baldwin shareholders." FAC, ¶ 39(I).

(Doc,. No. 67 at 6, quoting the FAC as shown.)

The second theory of liability, as the Director Defendants understand it, is for breach of the duty of disclosure, a subset of the duty of loyalty, by making misrepresentations. When Judge Rose decided the Motions to Dismiss, he noted that Plaintiff had listed fifteen allegations of misrepresentation in an Appendix to the Memorandum in Response and found that none of them satisfied the pleading requirements for a securities fraud claim (Entry and Order, Doc. No. 9, at 36.) Earlier in the same decision, he had found that at least one allegation of misrepresentation – the February 28, 2001, statement that "the goal of restoring Baldwin to profitability is close at hand" – made at FAC ¶¶ 114-116 was sufficient under Fed. R. Civ. P. 12(b)(6). (Entry and Order, Doc. No. 9, at 10-11.)

The Director Defendants also understand Plaintiff to be asserting, as an alternative theory of liability or description of their duties as directors, that they should be subject to the "enhanced entire fairness scrutiny" applicable when a business is for sale, as prescribed in *Revlon, Inc., v. MacAndrews & Forbes Holdings, Inc.*, 506 A. 2d 173, 182 (Del. 1986); and *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A. 2d 1261, 1288 (Del. 1988)(Motion Doc. No. 67, at 18).

**Plaintiff's Response**

Plaintiff has combined its opposition to Defendant Hendricks' Motion for Summary Judgment and the Defendant Directors' Motion into one document, Plaintiff's Combined Memorandum, Doc. No. 74, so the arguments directed to the two sets of Defendants must be

7

disentangled.

Plaintiff argues at length that the questions (1) whether the *Revlon* standard was triggered and (2) whether the Director Defendants breached their fiduciary duties under *Caremark*[2] are questions of fact for trial (Combined Memorandum, Doc. No. 74 at 1-8)  It bases its argument that the Director Defendants failed in their oversight function on extended citation to the report of its expert Bart A. Brown. *Id*. at 10-15.  It asserts that "knowing misrepresentations made in connection with volunteered predictions of future financial performance, or in connection with a request for shareholder action, violate a director's fiduciary duty of complete candor," followed by eight pages of asserted misrepresentations. *Id*. at 15-23.  Finally, it asserts there is a genuine issue of material fact whether defendants acted to entrench themselves.  *Id*. at 23-29.  It ends the Combined Memorandum by agreeing with the Director Defendants that it cannot pursue and is therefore not pursuing any direct claim of any creditor against the Defendants.  *Id*. at 29-30.

**Directors' Reply**

The Director Defendants in their Reply Memorandum (Doc. No. 102) assert there is not sufficient evidence to support triggering a *Revlon* inquiry (Id. at 2-17) or that they failed in their duty if *Revlon* applies *(Id*. at 7-10) or that they are liable under the *Caremark* standard (*Id.* at 10-14). They note that all of the claimed misrepresentations relied on to prove violation of a duty to disclose are "previously unalleged statements."  *Id*. at 14.  Finally, they assert there is no evidence they sought to entrench themselvces.  *Id*. at 18-20.

---

[2]*In re Caremark Int'l Inc. Deriv. Litigation*, 559 A. 2d 1261 (Del. Ch. 1996).

8

**Analysis**

**Defendant Hefernan:** Although it does not expressly concede the point, Plaintiff offers no opposition to the assertion that it has no case against Defendant Hefernan. All claims against him should be dismissed with prejudice on that basis.

*Revlon:* The *Revlon* standard for evaluating a director's fiduciary duty of loyalty is triggered

> in any one of three specific circumstances: (i) where a corporation initiates an active bidding process seeking to sell itself; (ii) where a corporation initiates a reorganization involving a breakup of the company; and (iii) where, in response to a bidder's offer, a company abandons its long-term strategy to pursue an alternative transaction involving a breakup of the company.

*Paramount Communications, Inc., v. Time, Incorporated,* 571 A. 2d 1140, 1150 (Del. 1989), cited by Plaintiff as controlling authority, Doc. No. 74 at 1, n.1. The Delaware Supreme Court has also formulated the *Revlon* test somewhat differently as follows:

> The directors of a corporation "have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders." *Paramount Communications, Inc. v. QVC Network, Inc.,* Del. Supr., 637 A.2d 34, 43 (1994), in at least the following three scenarios: (1) "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company," *Paramount Communications, Inc. v. Time Inc.*, Del. Supr., 571 A.2d 1140, 1150 (1990) [Time-Warner]; (2) "where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company," id.; or (3) when approval of a transaction results in a "sale or change of control," *QVC,* 637 A.2d at 42-43, 47.

*Arnold v. Society for Sav. Bancorp.*, 650 A.2d 1270, 1290 (Del. 1994)

It is very clear from the record that Baldwin was considering a sale of all or part of its business – assets or parts of the business as going concerns – as part of deciding what to do to deal

9

with its very serious financial crisis at least as early as 1999. Selling all or part of the business was plainly something that Lehman Brothers, as the retained investment banker of Baldwin, was considering on Baldwin's behalf in early 1999. As Plaintiff notes, Defendant Hendricks told the Board in July, 1999, that meetings were being scheduled at a "high level" with Questor and an exploratory meeting had been set with Steinway. Employees Marks and Kimble made substantial progress toward a management buyout of Baldwin through A440, a venture in which they invited Defendant Hendricks herself to participate. There is some evidence that Hendricks was considering a management buyout herself. In September, 1999, the board was given a liquidation analysis and was considering bankruptcy if the company could not sell sufficient assets to be able to continue its core piano business.

None of these facts however, which are the facts relied upon by Plaintiff, establish that the company had put itself up for sale "by initiating an active bidding process," either to sell the company or to effect a reorganization involving a clear break-up. There is no evidence that any such active bidding process ever occurred. Lehman Brothers talked with a number of possible buyers but was unable to generate a prospect interested in buying the company. While initiating an active bidding process could have been one of the things Baldwin did in response to its desperate situation, in fact it did not do so.

Nor would the facts support a finding that "in response to a bidder's offer, [Baldwin] abandoned its long-term strategy and [sought] an alternative transaction involving the break-up of the company." *Arnold, supra.* There never was any such bid which resulted in a change of strategy.

Finally, there was never a transaction which resulted in the sale of the company or a change of its control. *Arnold, supra, citing QVC*.

Therefore, there are no facts upon which a reasonable finder of fact could conclude that the enhanced scrutiny standard of Revlon should be applied to the Director Defendants.

**Abdication Theory:** Plaintiff asserts, as noted above, that the Director Defendants abdicated their responsibility to oversee management and essentially delegated the management to Defendant Hendricks, in violation of their fiduciary duty of loyalty.

The Court has already held (Entry and Order, Doc. No. 9) that any lack of care argument which might be made under this theory is not viable because the Director Defendants are exculpated by the Certificate of Incorporation, as permitted by the Delaware Code.

Plaintiff relies on four cases as setting forth the authority for this theory, *Cede & Co. v. Technicolor Inc.*, 634 A. 2d 345 (Del. 1993); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A. 2d 1261 (Del. 1988); *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A. 2d 959 (Del. Ch. 1996); and *Stone v. Ritter*, 911 A. 2d 911 A. 2d 362 (Del. 2006). The Director Defendants accepted that case law as setting the appropriate standard, but argue that the evidence unequivocally establishes that they met the standard.

The Court need not reach that question because most of Plaintiff's proof that the Defendant Directors abdicated their responsibility is taken from the unsworn expert report of Bart A. Brown. (See Combined Memorandum in Response, Doc. No. 74, at 10-15.) Fed. R. Civ. P. 56(e) requires that affidavits setting forth facts relied on to defeat summary judgment must be upon personal knowledge. Here, the Plaintiff's principal reliance – indeed, almost all of its reliance – is on a completely unsworn report.[3]

The only references in this portion of the Combined Memorandum to evidence allowable under Fed. R. Civ. P. 56(e) show that the Board was aware when it adopted Defendant Hendricks'

---

[3]Plaintiff's references to the Brown report in the Combined Memorandum do not tell the Court where in the record to find that report. The report is in fact attached to Mr. Brown's Declaration which was filed May 9, 2008 (Doc. No. 87). In the Declaration, Mr. Brown only verifies his identity and the authenticity of the attached 77-page report. This is, of course, far from meeting the personal knowledge standard of Fed. R. Civ. P. 56(e) as to the contents of the report.

11

proposed strategic plan that there were inadequate systems in place for forecasting business results, that those systems never became fully satisfactory, and that it was eventually the dealers who forced the board to discharge Defendant Hendricks. (Combined Memorandum, Doc. No. 74, at 12 and 14, citing Connell depo.) This evidence, even construed most strongly in favor of the Plaintiff, would not support a conclusion that the Defendant Directors breached their fiduciary duty by abdicating their duty to oversee management of the company.

**Duty to Disclose Theory:** As the Director Defendants point out, all of the alleged misrepresentations relied on by the Plaintiff in the Combined Memorandum are new allegations, made for the first time in that document. In other words, they are not the asserted misrepresentations in the FAC which were meticulously analyzed by Judge Rose in denying the Motions to Dismiss. Plaintiff has not offered any theory under which a party can legitimately amend its complaint in the course of responding to a motion for summary judgment.

**Entrenchment Theory:** Finally, Plaintiff seeks to hold the Director Defendants liable on a theory that they acted to entrench themselves, in violation of their fiduciary duty to the shareholders.

Plaintiff offers no evidence from which a reasonable fact finder could conclude that any of the Director Defendants violated his duty of loyalty to the company by acting on any occasion to further his own interests. The authority cited by the Director Defendants unequivocally holds that acting to maintain one's own position as a director does not count as a breach of fiduciary duty (See Doc. No. 67 at 8-9; Doc. No. 102 at 20, n. 35.) But even if that were a breach, Plaintiff points to no evidence of such behavior by any one of the Director Defendants.

Plaintiff instead argues that the Director Defendants acted to entrench Defendant Hendricks. However, the argument is unsupported by evidence. Plaintiff does not even point to any purported

12

evidence with respect to any Director Defendant except for John Gutfreund. Much of the evidence Plaintiff points to of communication between Hendricks and Gutfreund occurred before he became a director. Plaintiff points to no evidence of any improper or corrupt motive on the part of any Director Defendant for any support they may have given to Defendant Hendricks' management of the company. The fact that one or more directors of a publicly-held company support the management in the face of shareholder or dealer criticism does not support an inference that they are breaching their duty of loyalty in doing so. Plaintiff's argument appears to be that Defendant Hendricks was doing such a poor job that there must have been some improper motive for keeping her. To invite the finder of fact to make that inference would be to invite speculation.

## Conclusion

Based on the foregoing analysis, the Director Defendants' Motion for Summary Judgment should be granted and the FAC dismissed as to them with prejudice.

October 1, 2008.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate

Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).