# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

IN RE: DWIGHT'S PIANO COMPANY,
DEBTOR

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, on its own behalf and on behalf
of Dwight's Piano Company, et al.,

                    **Plaintiffs,**

vs-

KAREN L. HENDRICKS, et al.,

                    **Defendants.**

**Case No. 1-:04-CV-066**

**(formerly Bankruptcy Court
Case No. 01-13951; Adversary
Proceeding No. 02-1158)**

**Judge Thomas M. Rose**

_____

### ENTRY AND ORDER GRANTING JUDGMENT FOR KAREN L. HENDRICKS AND AGAINST THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND TERMINATING THIS CASE

_____

Baldwin Piano and Organ Company ("Baldwin," n.k.a. Dwight's Piano Company) was a well-known piano manufacturer and marketer of acoustic and digital keyboard instruments. On May 31, 2001, Baldwin filed for protection under Chapter 11 of Title 11 of the Bankruptcy Code. The action that is now before the Court was commenced in the Bankruptcy Court for the Southern District of Ohio in Cincinnati on May 30, 2002. It was commenced as an Adversary Proceeding in Baldwin's Chapter 11 case. The Chapter 11 proceeding is Case No. 01-13951 and the Adversary Proceeding is Case No. 02-1158.

About thirty days after the Adversary Proceeding was filed, the Defendants filed a motion in the United States District Court for the Southern District of Ohio, Western Division in Cincinnati, for withdrawal of reference. On May 12, 2003, this Motion was granted in Case No.

1:02-MC-031. The matter was then reassigned and given its current Case No. 1:04-CV-066, after which it was referred to this Court.

The remaining Plaintiff in this action is the Official Committee of Unsecured Creditors of Dwight's (the "Unsecured Creditors"). The remaining Defendant in this action is Karen L. Hendricks ("Hendricks") who was both a director and officer of Baldwin. The remaining claim for relief is an allegation that Hendricks breached her fiduciary duties to Baldwin.

The breach-of-fiduciary duty claim was tried to the Court on April 20, 21, 22, 23, 27, 28, 29, and 30, 2009. Since then, the Parties have submitted Proposed Findings of Fact and Conclusions of Law (docs. #208, 213) and Objections thereto (docs. #214, 215.) The breach-of-fiduciary claim is, therefore, ripe for adjudication. The Findings of Fact will first be set forth followed by the Relevant Legal Provisions and Judgment On the Claim.

## FINDINGS OF FACT

Hendricks was hired as Baldwin's President and Chief Executive Officer ("CEO") in November 1994 to replace R.S. "Dick" Harrison ("Harrison"). (Uncontroverted Fact ("UF") 9.) Harrison began working at Baldwin as assistant treasurer and served as Baldwin's President and CEO until replaced by Hendricks. (UF 8.) Harrison was the chairman of Baldwin's board until he resigned from Baldwin as an employee and director in January 1997. (Id.)

Hendricks became Chairman of Baldwin's Board of Directors (the "Board") in January 1997. (UF 9.) She served as President until February 28, 2001, and as a director until she resigned from the Board on May 10, 2001. (Id.) Throughout her tenure at Baldwin, Hendricks was a shareholder, ultimately owning 207,500 shares of Baldwin stock. (Id.)

In addition to Hendricks and Harrison, the Baldwin board, during part or all of the relevant time period, consisted of George E. Castrucci ("Castrucci"), Joseph H. Head, Jr. ("Head"), Roger L. Howe ("Howe"), William B. Connell ("Connell"), and John H. Gutfreund ("Gutfreund"). (UF 3-8.) Prior to Hendricks' arrival, Baldwin was, according to Connell, "a company where virtually every part of the company, other than the balance sheet had been neglected and needed attention. (Tr. 385.)

When Hendricks joined Baldwin, Baldwin faced serious competition from Asian piano manufacturers who were able to produce pianos more efficiently and at a lower cost than Baldwin. (UF 11.) Piano retailers that Baldwin relied upon to sell its products were not exclusive to Baldwin, and were able to sell the lower-priced Asian pianos rather than Baldwin's. (UF 12.)

In 1995, shortly after her arrival at Baldwin, Hendricks prepared a five-year strategic plan to improve Baldwin's financial performance and enhance profitability and shareholder value over time. (UF 13; Trial Transcript ("Tr.") 392-93.) The initial strategic plan assumed that Baldwin could grow its three main businesses - Music (pianos), Keyboard Acceptance Corporation and Signature Leasing ("KAC")(retail financing) and Contract Electronics ("CE")(electronic components). (UF 14.) The plan also called for Baldwin to: implement meaningful marketing efforts, which were nonexistent when Hendricks arrived; grow international sales, which were nonexistent when Hendricks arrived; and eliminate businesses determined to be "non-core," such as contract furniture manufacturing and the church organ business. (UF 15, 16; Tr. 274-75.)

In April 1996, the Board unanimously approved the strategic plan. (Tr. 77-78.) The Board found that the strategic plan was "likely to result in substantial increases in long-term

shareholder value" and "a principal factor in achieving this long-term shareholder value was allowing management sufficient time to execute the strategic plan as outlined." (Id.) The Board found that another key factor to success was "the necessity to keep all three lines of business of the company intact." (Id.) Shortly thereafter, Hendricks and her management team began implementing the strategic plan. (UF 20.)

### Hendricks' Relationship With Harrison

Baldwin was the only place Harrison ever worked. (Tr. 48.) He began working in the treasurer's department.

Harrison was one of two purchasers of Baldwin in a leveraged buyout from bankruptcy in 1983. (Tr. 46; Deposition of George Castrucci ("Castrucci Dep.") 21-22 June 17, 2008.) Harrison became the President and chief financial and administrative officer. (Id.) Baldwin was then operated to pay down the debt as quickly as possible. (Id.) By the time Castrucci came onto the Board in 1987, Baldwin was again a public company with Harrison and another individual holding about 80% of the stock. (Id.) As a result of running Baldwin as a leveraged buyout company, engineering had been severely curtailed, new product development had been severely curtailed, research and development had been severely curtailed, and marketing activities and dealer development had been somewhat curtailed. (Id.) When Connell came on the Board in 1995, he concluded that Baldwin "was just a mess" and needed to be "almost totally rebuilt from the ground up." (Tr. 379.) According to Connell, Baldwin had two or three times the manufacturing capacity that it needed and the "manufacturing processes and equipment were in the dark ages." (Id.)

Harrison, who was Chairman of the Board at the time, was involved in and supported the hiring of Hendricks as President and CEO in 1994. (Tr. 52.) Harrison's role in the day-to-day operation of Baldwin diminished after the hiring of Hendricks. (Id.)

The relationship between Hendricks and Harrison was strained. Connell testified that it was strained from the outset. (Tr. 398.) Harrison testified that it did not become strained until after the first eighteen or nineteen months when they disagreed on certain financial plans. (Tr. 52-54.) This relationship was further complicated as Hendricks surfaced numerous operational problems with Baldwin, many of which were known to Harrison but had not been raised with the Board. (Tr. 399-400.) When Hendricks made the Board aware of these problems, Harrison's embarrassment was evident. (Id.)

In late 1996, Harrison demanded that the Board remove Hendricks and that he be reinstated as CEO. (Id.) After Hendricks learned of Harrison's efforts to oust her, she wrote a letter to the Board stating that if she was going to be Baldwin's CEO, she needed the Board's full support. (Tr. 406-07.)  When the Board agreed that Hendricks should lead Baldwin, Harrison resigned. (Tr. 406.) In January 1997, Hendricks was elected Chairman of the Board, replacing Harrison. (UF 9; Tr. 407.)

### Hendricks' Relationship With Marks

Shortly after Hendricks came to Baldwin, it was discovered that the individual that had operated Baldwin's plant in Juarez, Mexico for 29 years had stolen millions of dollars from Baldwin. (Deposition of Randy Marks ("Marks Dep.") 10-11 Jan 3, 2008.) In 1996, Hendricks hired Randy Marks ("Marks") as an independent consultant to fix the problems and restore order at Juarez. (Id. 9-10.)

Hendricks later expanded Marks' engagement to an evaluation of Baldwin's entire manufacturing operation. (UF 26.) According to Marks, he found "massive amounts of inventory, massive amounts of work in progress and very little understanding of the metrics that would drive their own manufacturing." (Marks Dep. 15.) He found "very backward and very antiquated manufacturing operation that was in desperate need of being modernized on virtually every aspect." (Id. 16.)

Effective January 1, 1998, with Board approval, Hendricks asked Marks to join Baldwin as its Executive Vice-President of Piano Operations. (UF 28; Tr. 416.) Marks says that becoming employed by Baldwin was a major life change and involved a significant pay cut. (Marks Dep. 23-24.)  Marks also thought it was possible to "turn Baldwin around and make it a star." (Id. 24.) When he was hired, Marks told Hendricks that he was interested in equity in a management buyout ("MBO"). (Id. 25.)

According to Marks, he and Hendricks got along extremely well. (Marks Dep. 62.) Marks was praised for his work. (Id.)

In 1999, Marks thought it was time to enact his long-conceived plan of buying Baldwin and taking it private. (Marks Dep. 64.) He selected this time because he thought it would be wise not to make all the effort to improve operations and make it more difficult to buy Baldwin. (Id.) Duane Kimble ("Kimble") was a part of the takeover plan. (Id.) Marks and Kimble envisioned a new company called "A440."[1] (Id. at 65.) Marks and Kimble were interested in acquiring the music side of Baldwin's business and not the financial side or the contract electronics. (Id.) On

---

[1]A440 is a piano tuner's designation for perfect pitch. (Marks Dep. 65.)

March 19, 1999, Marks and Kimble delivered a letter to Hendricks, as Chairman of the Board, formally expressing an interest in acquiring Baldwin. (Tr. 932)

Marks and Kimble invited Hendricks to be a part of their proposal to buy-out the company. (Marks Dep. 33-34.) Hendricks declined and advised the Board that she had no interest in being part of any buy-out because of her retirement plans. (Tr. 431, 608, 611; Castrucci Dep. 116-17.) Connell testified that the Board's reaction to the A440 proposal was positive but the Board realized that it needed to be extremely careful to ensure that Marks and Kimble were not favored over any other potentially interested party. (Tr. 431-32.)

In mid 1999, Hendricks' and Marks' relationship began to crumble. (Marks Dep. 86-88.) According to Marks, Hendricks turned down key strategic ideas that he had proposed. (Id.) Marks spoke with Connell on one of those ideas and Connell indicated to Hendricks that she needed to "rein Randy in" on that idea and others. (Tr. 439-41.) According to Connell, Hendricks took a hard line with Marks that Baldwin did not have the time and resources to pursue his strategic ideas. (Id.)

On August 12, 1999, Hendricks delivered a letter to Marks stating: "The purpose of this letter is to ensure that you are fully aware of the concerns that I have regarding your performance in the expanded leadership role you assumed earlier this year in the Music Business, and to outline my expectations of you at Baldwin…" (DX 129.) Hendricks testified that Baldwin needed Marks' undivided attention and that Baldwin was in a crisis because Marks was not effectively managing the day-to-day operations of the Company. (Tr. 743-44.) According to Jerri Hall ("Hall"), Baldwin's Vice-President of Human Resources, Hendricks had no intention of firing Marks when she wrote this letter. (Tr. 348.)

-7-

After receiving Hendricks' letter, Marks decided to bypass Hendricks and go directly to the Board. (Marks Dep. 92-93.) On August 13, 1999, Marks met with Hall. (Tr. 350-51.) Marks was angry with Hendricks and told Hall that he had been approached by several employees asking him to write a letter to the Board to remove Hendricks and that, if Hendricks was not removed, the employees would walk out.[2] (Id.) Marks also attempted to recruit Hall to the effort to have Hendricks removed. (Tr. 350-51, 360, 366-67.)  Marks later testified that he was not going to arrange a walk-out of the employees and just wanted to get information regarding the status of Baldwin in front of the Board. (Marks Dep. 151.)

After meeting with Marks on August 13th, Hall immediately advised Hendricks of Marks' plans. (Tr. 350-51.) Hall told Hendricks that Marks was trying to line people up, including Hall, against her to go to the Board. (Id.) Hendricks was shocked. (Id.)

Hendricks and Hall then contacted directors Head and Gutfreund by telephone regarding Marks' conduct. (Tr. 707, 1028.) Directors Head and Gutfreund advised Hendricks to do what she thought was best for the Company and the Board would stand behind her decision. (Id.)

Thereafter on August 13th, Hendricks and Hall met with Marks. (Tr. 352, 709.) According to Hall, Hendricks informed Marks that she was aware of his attempts to rally employee support to have her removed. (Id.) Hendricks then advised Marks that his conduct was "insubordinate and inappropriate and she discharged him for cause." (Id.)

### Baldwin's Forecasting

---

[2]Not a single employee who reported to Marks left Baldwin after Marks was terminated. (Tr. 1029-30.)

Kimble, as Baldwin's Chief Financial Officer, was charged with overseeing Baldwin's accounting function and with preparing Baldwin's forecasts, projections and budgets. (Tr. 914.) The budgets prepared by Kimble and his staff were approved by Hendricks and the top management team and then presented to the Board by Kimble. (Tr. 918.)

While Kimble admitted that Baldwin's ability to prepare accurate monthly forecasts was not without flaws, he believed that Baldwin's forecasts were reasonable and achievable. (Tr. 915-16.) Kimble believed that the process for forecasting can be improved but never perfected. (Tr. 958.) He also believed that the Company continually attempted to improve its forecasts. (Tr. 957.) This was confirmed by Board member Connell who testified that Hendricks hired competent employees and purchased computers in order to improve Baldwin's forecasting systems. (Tr. 446.) At least one Board member also thought Baldwin's forecasts were reasonable. (Castrucci Dep. 83.)

When matters involving forecasts or long-term planning were brought to the Board, the Board had a robust discussion thereof. (Tr. 31-32.) The Board probed, questioned and debated the forecasts and long-term planning and determined how management had constructed those forecasts and the long-term planning. (Id)

Karl A. Jarek ("Jarek"), a forensic accountant and certified fraud specialist, analyzed Baldwin's forecasting systems. (Tr. 978-92.) He concluded that Baldwin had a forecasting system in place from 1996 through 2001 that met the eleven guidelines on prospective financial information issued by the American Institute of Certified Public Accountants. (Id.) Jarek further testified that applying the 11 guideline factors will greatly improve the chance of the accuracy of the forecast, but there are no guarantees when it comes to forecasting. (Id.)

**Inventory Levels**

During the time period relevant to the events that are the subject of this matter, Baldwin was challenged by the management of its inventory levels. Specifically, increases in inventory were of concern to the Board. (Castrucci Dep. 80.) There were several reasons why Baldwin's inventory increased during the period.

In 1998, Baldwin planned to increase its inventory of "plates." (Tr. 1020-22.) Baldwin decided to build a piano plate facility in Brazil so that it would no longer need to purchase plates from its supplier in the United States. (Id.) Baldwin had quality and price problems with its supplier in the United States. (Id.) The inventory of plates was built up in advance to account for any problem with start-up of the new facility in Brazil. (Id.)

A second reason for the increase in inventory was the consolidation of Baldwin's manufacturing plants. (Tr. 1021-22.) Baldwin was closing its Conway plant and moving its assembly operation to its Truman plant. (Id.) As a result, Baldwin stockpiled grand pianos to ensure that there would be a sufficient supply while the consolidation was taking place. (Id.)

The third reason for an increase in inventory levels was the Asian currency devaluation which occurred in 1997. (Tr. 428.) The currency devaluation led to Asian piano manufacturers producing pianos as a much lower cost than could Baldwin. (Id.) For example, at the end of March 1998, Chinese vertical piano shipments to the United States had increased 74% from the previous year. (Tr. 1018.)

Prior to the Asian currency devaluation, Baldwin had built up piano inventories to support the introduction of new product innovations in its line of grand pianos. (Tr. 428.) The innovations had resulted in optimistic sales forecasts. (Tr. 450-51.) Ultimately, the Asian piano

manufacturers were able to produce and sell pianos at a much lower cost than Baldwin and

Baldwin was left with a significant amount of high-priced pianos in its inventory. (Tr. 428,

1019.) To maintain its market share, Baldwin reduced the price of its pianos. (Id.)

## Governance and the Retention of Expert Advisors

On January 26, 1999, Hendricks contacted Stuart Seigel ("Seigel") at the firm of Arnold

and Porter with regard to her Employment Agreement and Change of Control Agreement. (PX

34.) Seigel acknowledges the contact but has no memory of any advice. (Seigel Dep. 86.) None

of the Board members who testified remember that Hendricks specifically informed them of her

contact with Seigel but they do remember that Hendricks would have discussed her employment

agreement with someone at Arnold and Porter. (Deposition of Roger Howe ("Howe Dep.") 116-

17 June 4, 2008; Castrucci Dep. 119, Deposition of Joe Head ("Head Dep.") 17 June 19, 2008;

Tr. 504.)

The Board also hired experts in a variety of fields to assist with the implementation of its

strategic plan. For example, in February 1997, with Board approval, Hendricks hired Lehman

Brothers, an investment banking firm, to provide financial and advisory services to Baldwin. (UF

27.) The scope of Lehman Brother's engagement was to review all strategic alternatives that

Baldwin might have and to provide the Board with its seasoned and objective thinking on the

subject. (Tr. 412.) The strategic alternatives that Lehman Brothers was to review ranged from

reviewing Baldwin's strategic plan, to selling off pieces of Baldwin's business to reinvestment in

the core business to selling the entire Company. (Id.)

The Board also retained Larry Larose ("Larose") of the law firm of Cadwalader,

Wichenshan & Taft ("Cadwalader") as more specialized counsel to advise Baldwin concerning

proxy contests and other matters specific to public corporations.(Tr. 410-11.) At that time,

Baldwin's Board was expecting some sort of proxy contest prompted in part by shareholder

Kenneth L. Pavia.[3] (Id.) The Board also retained The Dilenschneider Group to advise them on

public relations strategy regarding the expected proxy contest. (Id.)

As a result of its meeting on April 1, 1999, the Board approved the hiring of Attorney

Stuart Seigel ("Seigel"), an attorney with the Arnold and Porter firm, to advise Hendricks in her

role as Chairman. (JX 26.) Board member Joe Head was to meet separately with Hendricks to

work out the details. (Id.) Head testified that Hendricks had certain contractual arrangements

with Baldwin which could have been impacted by various courses of action and she wanted

counsel to assist her in evaluating the impacts of the various courses of action. (Head Dep. 16

June 19.)

Seigel testified that Baldwin was his client and not Hendricks. (Deposition of Stuart E.

Seigel ("Seigel Dep.") 20, 56-57, 76 Sep. 12, 2007.) According to Seigel, the scope of his

assignment was to assist Baldwin and Hendricks in her role as Chairman in resolving financial

difficulties that Baldwin was experiencing in a manner that would be satisfactory to some

dissident shareholders. (Id.)

Professor John E. Coffee, Jr. ("Coffee") is a corporate governance expert who examined

the actions of the Board, including Hendricks. (Tr. 872-73.) He found that, because the Baldwin

Board did not have particular expertise in the area of mergers and acquisitions, it was appropriate

for Hendricks to assemble a "kitchen cabinet" of expert advisors that did have the appropriate

---

[3]In July of 1996, Bolero Investments acquired 3.7% of Baldwin's outstanding stock and
Bolero's principal investor was Ken Pavia. (UF 21.) Hendricks and the Board perceived Pavia as a
"shareholder activist" and a "disruption" to Baldwin's business. (Id.)

level of expertise.(Tr. 875-76.) Coffee testified that it is good corporate practice for the CEO to retain the specialists that he or she feels are needed to advise the Board particularly when the Board lacks competence in certain areas. (Tr. 878-79.) Coffee also testified that it is obligatory for a CEO to vet certain issues with specialists before taking those issues to the Board such that a discussion of those issues with the Board may be productive. (Tr. 880.)

The Unsecured Creditors presented the expert testimony of Bart A. Brown, Jr. ("Brown"). (Tr. 767.) Brown has worked as a CEO or board member of troubled companies since 1990. (Tr. 770.) He articulated the following "basic principles" that he says are important in situations involving financially troubled companies: communicate to the people in the company; develop a business plan for recovery; execute the business plan with a sense of urgency; have back-up plans; control the company's cash; and total and complete candor with the board.  (Tr. 771-74.) Brown later testified his practice was to use his directors as a sounding board and not use a "kitchen cabinet." (Tr. 834.)

Based upon a review of the records in this case and interviews of Harrison, Marks and Perry Schwarz [Phillip Schultz??], Brown concluded that some of the information that Hendricks presented to her "kitchen cabinet" should have been presented to the Board. (Tr. 775-85.) Specifically, according to Brown, Hendricks told her "kitchen cabinet" that an internal growth plan would not work but she did not tell this to the Board. (Tr. 786.) Brown also testified that, according to all of the documents that he reviewed, Hendricks did not report her consideration of an MBO. (Tr. 786.) Brown also, based upon his review of the record, testified that Marks and Kimble were treated differently than others who expressed an interest in Baldwin. (Tr. 789.)

-13-

Brown concluded that Hendricks was not following good corporate practice because she was considering her own MBO and inserting herself in the middle as the gatekeeper for the competing bid. (Tr. 801.) Brown also concluded that Baldwin was harmed to the extent of at least $30 million because, had the Marks and Kimble proposal come to fruition, Baldwin would have received $30 million. (Tr. 811.) On cross examination regarding communications between Project A440 and the Board, Brown indicated that the Board minutes appear to conflict with Morro's testimony but he also admitted that he had not seen Morro's testimony until after he prepared his report. (Tr. 828-29.) Brown also admitted that he did not find "one specific iota of [financial] information" that Marks and Kimble were precluded from obtaining from Hendricks. (Tr. 852-53.)

The Unsecured Creditors also called Lyman Paul Quentin Johnson ("Johnson") as an expert witness. (Tr. 1060.) Johnson is a law professor at the Washington and Lee College of Law teaching securities, corporate matters and business planning. (Tr. 1062.) Johnson has also done research in the corporate governance area narrowing in on fiduciary duties. (Tr. 1063.)

Johnson reviewed certain of the deposition transcripts and documents in this case and observed that, in his opinion, Hendricks' interests were not fully aligned with the stockholders because a CEO always has interests that are different from those of the stockholders. (Tr. 1065.) Johnson also observed that, during the 1998-99 time frame, Hendricks, with the acquiescence of the Board, acted as a committee of one which is always bad practice. (Tr. 1069.) Johnson further observed that, by not disclosing Marks' and Kimble's MBO to the Board, Hendricks was indicating that she was not going to disclose to the Board matters that might clash with

stockholders' interests. (Tr. 1072.) Johnson thought that Hendricks should have told the Board

that if Project A440 came to fruition, she would no longer be the CEO of Baldwin. (Tr. 1077.)

Johnson explains that it is not unusual for a buyer in this context to not actually secure

committed financing before knowing that a bid will be taken seriously. (Tr. 1077.) Johnson also

concluded that good corporate practice means a healthy, open, fair and even-handed process that

does not thwart some bidders and allows all bidders to take their case to the board. (Tr. 1079.)

Upon cross examination, it was determined that Johnson had made assumptions for purposes of

his opinion based upon a letter from the Unsecured Creditor's counsel that were in conflict with

testimony otherwise presented. (Tr. 1082-89.)

## Baldwin's Exploration of Strategic Alternatives

Near the end of 1998, the Board was considering all strategic alternatives including a

possible sale of the Company. (Tr. 601.) At that time, the Company's financials had deteriorated

and Pavia had indicated an interest in buying the Company. (Tr. 601-03.) Then, in the spring of

1999, Marks and Kimble indicated an interest in buying the Company. (Tr. 602.)

The Board then engaged Lehman Brothers, as indicated above, to "put some dimension

around the Company." (Tr. 602.) This was done because the Board wanted to be prepared to

respond if there was an "earnest offer" for the Company. (Id.) However, the Board, at that time,

was not prepared to attempt to auction the Company. (Tr. 603.)

On March 4, 1999, Lehman Brothers presented their work, termed a "Descriptive

Memorandum," to the Board. (Tr. 604-05; JX 23; JX 24; DX 114.) The materials presented

included an overview of the Company, a preliminary valuation and a summary of potential

buyers, both strategic and financial, for Baldwin's three divisions – Music, CE and KAC. (Id.)

-15-

Lehman Brothers' work for Baldwin's Board was given the transaction code name "Project Ludwig." (UF 32.)

Lehman Brothers told the Board that Baldwin was "not a very attractive property" in part because few if any individual entities would be interested in purchasing all of Baldwin's parts. (Tr. 429-30.) Lehman Brothers, however, wanted to "test the waters" to see if this conclusion was correct and the Board agreed to let them do so. (Id.)

In the spring of 1999, around the same time as Project Ludwig was getting underway, Baldwin was exploring a strategic opportunity with Brunswick Billiards. (Tr. 436-37.) At this time, the manufacturing operations at Baldwin's Greenwood plant were a concern. (Id.) Baldwin sought to spread Greenwood's manufacturing costs by producing Brunswick's pool tables at the Greenwood plant. (Id.)

Hendricks, Castrucci, Head, Howe and Kimble thought that the strategic alliance with Brunswick had the potential to return Baldwin to profitability. (Tr. 621, 925; Castrucci Dep. 139; Head Dep. 47, Howe Dep. 113.) Director Connell thought the strategic alliance with Brunswick could have generated "$10 or $15 million [in] incremental business" which "would have [had] a major affect on [the Company's] ability to keep the Greenwood plant open and make it productive." (Tr. 436; Marks Dep. 82-83.) Director Castrucci thought the strategic alliance with Brunswick could "change the profit picture of Baldwin either going forward or to any potential purchaser…." (Castrucci Dep. 121.)

Upon Hendricks' recommendation, the Board unanimously agreed to stop Project Ludwig until the deal with Brunswick was consummated. (Tr. 679.) Lehman Brothers responded

with a recommendation that Project Ludwig be continued on a slower schedule to coincide with the strategic discussions with Brunswick. (JX 30.) With this the Board agreed. (JX 32.)

On April 14, 1999, Hendricks informed the Board on the status of the Brunswick negotiations. (PX 44.) She also recommended that Lehman Brothers be put back on a controlled process that is moving forward. (Id.) Finally, she indicated that informing Marks or Kimble about putting Lehman Brothers back in the process or about alternatives regarding the Board's response to proxy proposals would "activate" Marks and Kimble. (Id.) Hendricks explained that she did not want to distract Marks and Kimble from their work on the Brunswick deal but that she had no reason to think that Project A440 had distracted Marks and Kimble. (Tr. 629.)

In June 1999, the Brunswick negotiations terminated without a strategic alliance being formed. (Tr. 645.) After the Brunswick deal failed to materialize, Lehman Brothers and Hendricks met with potential buyers Boosey and Hawkes, Questar, Steinway and Gibson Guitar. (Tr. 640-45.) Hendricks did not want Marks and Kimble to know about these meetings just as she did not want those with whom she met to know about Marks' and Kimble's proposal. (Id.) None of the above mentioned firms made a written offer or provided proof of financing. (Id.)

Project Aspen

The Unsecured Creditors identified a document entitled "Project Aspen Working Group List." (PX 40.) The document is attached to a letter from Hendricks to Myron Lieberman ("Lieberman"), Stuart Seigel and Bob Dilenschneider and is dated March 26, 1999. In the letter, Hendricks thanks all of the addressees for "your wise counsel and support." (Id.) The attached List contains contact information for Hendricks, Lieberman, Seigel, Dilenschneider and Gutfreund. (Id.)

However, the Unsecured Creditors presented no further evidence regarding what "Project Aspen." was or its purpose. Hendricks does not deny the existence of "Project Aspen" but has no memory of it. (Tr. 672-73.) Seigel has no memory of "Project Aspen" either. (Seigel Dep. 29-30.) Seigel does, however, recall advising Hendricks to consult with Lieberman regarding financing sources, investors and other persons who might play some role in resolving the problems faced by Baldwin at the time. (Id. 19.)

Project A440

At nearly the same time as Project Ludwig was initiated and Baldwin was exploring the strategic opportunity with Brunswick, Marks and Kimball delivered a letter to Hendricks, as Chairman of the Board, formally expressing an interest in acquiring Baldwin. (Tr. 932.) Marks and Kimble had specifically asked Hendricks for the opportunity to submit a bid. (Tr. 609.) The letter indicating interest was delivered on March 19, 2009. (Tr. 932, DX 116.)

Marks and Kimble termed the new company that they were going to form "A440." (Marks Dep. 65.) They thought Baldwin was worth $8 per share but thought they might have to bid higher as a inducement to shareholders to sell their shares. (Id. 77.)

Marks envisioned that the new company would be managed by he, Kimble and Hendricks as co-directors. (Marks Dep. 68.) When told, according to Marks, Hendricks expressed concern that she would no longer be CEO under the proposed new company. (Marks 69.) Hendricks was concerned, according to Marks, because not being a CEO would impact her ability to obtain outside board positions. (Id.) Again, according to Marks, Hendricks retained counsel from New York to advise her on her personal position with respect to the possibility of

her joining a management buyout and the impact of that on her responsibilities as the CEO of Baldwin. (Id. 69.) Hendricks declined to participate. (Tr. 431.)

Marks and Kimble started the process by preparing a proposal and giving it to Hendricks. (Marks Dep. 72.) Hendricks insisted at the time that everything go through her. (Id.)

On March 20, 1999, the Board met via telephone to discuss the implications of the letter received from Marks and Kimble and to agree on the next steps. (JX 25.) Larose outlined the level of commitment that Marks and Kimble might have based upon certain assumptions. (Id.) Steve Wolitzer ("Wolitzer") summarized his views of the impact on other possible sponsors and concluded that competitive bidders must know Marks' and Kimble's position and interest in being a part of the process. (Id.) The Board agreed that Larose "would speak with Duane and Randy… to ascertain the extent of their communications and whether they should be included in the process. (Id.)

The Board wanted Project A440 to be vetted through Lehman Brothers, the same as everyone else. (Castrucci Dep. 115.) Further, the Board intended that Marks and Kimble communicate regarding Project A440 directly to Lehman Brothers. (Id. at 116.) However, according to Marks, Hendricks gave him and Gimble "very explicit" instructions that all correspondence, all discussions and all communications regarding Project A440 were to go exclusively through her. (Id. at 74.)

The Board again met on March 22, 1999. (Id.) Larose related that Marks and Kimble stated that they had retained counsel and that they had not approached financial sponsors with specifics. (Id.) Marks and Kimble agreed to forward their proposal to Lehman Brothers to be a

-19-

part of the process. (Id.) They also agreed that other parties could be told of their interest in being a part of the process. (Id.)

On April 27, 1999, Philip F. Schultz ("Schultz"), Marks' and Kimble's attorney, forwarded a marked-up copy of Lehman Brothers' confidentiality agreement to Larose. (JX 33.) On May 24, 1999, Schultz forwarded an executed copy of the confidentiality agreement to Wolitzer and asked for three copies of the Descriptive Memorandum that Lehman Brothers had prepared. (JX 36.) The confidentiality agreement provides that Marks and Kimble communicate "only to Lehman Brothers" regarding "the proposed transaction." (JX 36.) Also, the Board agreed that Marks and Kimble should go through Lehman Brothers. (Tr. 433, 435.)

The next day, Hendricks informed the Board that Marks and Kimble had signed the confidentiality agreement and had come into the process but were not aware of any of Lehman Brothers' current efforts regarding Baldwin. (JX 35.)

Marks does not remember receiving any information from Lehman Brothers beyond a letter than Lehman Brothers sent to anyone who asked for information. (Marks Dep. 115-16.) However, Marks, as an insider, was not looking to Lehman Brothers to provide information to him but was looking to Lehman Brothers to provide information regarding Project A440 to Baldwin. (Marks Dep. 116.) Thus, Marks does not recall having "much" interaction with Lehman Brothers. (Id.) Kimble does not remember receiving any feedback from Hendricks regarding Project A440 nor does he remember her discouraging them either. (Tr. 944.)

Hendricks testified that the Board had her be the interface between Marks and Kimble and Cadwalader and Lehman Brothers. (Tr. 615.) However, this was no different than any of the other potential financial sponsors. (Id.)

-20-

Steven B. Wolitzer ("Wolitzer") was the global head of Lehman Brothers' mergers and acquisitions division. (Deposition of Steven B. Wolitzer ("Wolitzer Dep.") 6 Jul 8, 2008.) Wolitzer represented Lehman Brothers in Project Ludwig. (Id. 12-19.) Wolitzer does not recall having any specific conversations with Marks and Kimble regarding Project A440 but does remember that Marks, Kimble and their lawyer at Taft Stettinius were involved in the discussions regarding their financial sponsors. (Id. 35, 37.) Lehman Brothers preferred to contact financial sponsors and Marks and Kimble wanted to have more control over the process. (Id. 38-39.) Thus, Marks and Kimble were required to advise Lehman Brothers of the status of their discussions with proposed financial sponsors.

On July 16, 1999, Wolitzer and Kevin Lewis, another Lehman Brothers' employee assigned to Project Ludwig, presented their perspective regarding Marks' and Kimble's process and the possible issues it creates for Lehman Brothers' efforts to the Board. (JX 41.) Specifically, Wolitzer and Lewis indicate that the parallel process involving Project A440 creates disruption in the sales process. (Id.)

Hendricks did not discuss anything of substance about Project A440 with the Board. (Castrucci Dep. 141, Tr. 498) The Board felt that it had hired Lehman Brothers to manage the process. (Tr. 498.) The Board never considered Project A440 seriously because its financial backing was never received. (Howe Dep. 99.)

A part of Wolitzer's and Lewis's presentation regarding Project Ludwig given at the time indicates that Marks and Kimble were working on a parallel process to do a management buyout ("MBO"). (Id.) This presentation also indicates that Marks and Lehman have contacted two equity sources and three debt sources. Wolitzer testifies that this information came from Marks

-21-

and Kimble. (Wolitzer Dep. 75.)  Kimble recalls having discussions with Lehman Brothers but
he does not recall whether he had those discussions as Baldwin's CFO or as a part of Project
A440. (Kimble Dep. 976.) When asked about specific meetings with Marks and Kimble
regarding Project A440, Wolitzer reviewed Board minutes from the Board meeting on July 16,
1999, and testified that, although he does not remember specific contacts with Marks and
Kimble, it would be "unprecedented" for Lehman Brothers to document something about a
process when Lehman Brothers had not specifically spoken to the potential buyer. (Wolitzer
Dep. 249.)

Because neither Marks nor Kimble had the individual wherewithal to acquire Baldwin,
they approached several financial sponsors to attempt to obtain financing. (Tr. 933-34, PX 54;
PX 55.) One such sponsor was the Bank of Montreal. (Tr. 934.)

The Bank of Montreal was represented at trial by William C. Morro ("Morro"). At the
time when Project A440 financing was being discussed, Morro was the head of the U.S.
Merchant Bank for the Bank of Montreal group of companies in Chicago. (Deposition of
William C. Morro ("Morro Dep.") 5 Feb. 6, 2009.) The business unit that he worked for was
called BMO Nesbitt Burns Equity Partners ("Nesbitt Burns"). (Id.)

Nesbitt Burns believed that it could lead a credible proposal to the Baldwin Board in
support of Project A440 if it would invest $15 million and gain an additional $30 million from
close customers. (Id. 19-20.) However, according to Morro, the Project A440 investment
opportunity never advanced in any meaningful way beyond the preliminary stage. (Id. 17.) It
never advanced, according to Morro, because Nesbitt Burns was not able to get Baldwin's
attention and had to rely upon Marks and Kimble to do so. (Id.) Nesbitt Burns never reached the

-22-

point where it was doing diligence on Baldwin and was "just trying to figure out whether this was something worth allocating resources to." (Id. 22.)

There was never a firm financial commitment to Project A440 by Nesbitt Burns because it was too soon in the process. (Id. 28-29.) Nesbitt Burns was still evaluating its level of interest and had not made a formal proposal to Marks and Kimble. (Id.) Ultimately Marks and Kimble did not receive a formal financing commitment from any lending institution. (Tr. 938; Marks Dep. 136-37.) Work on Project A440 ceased shortly after Marks left Baldwin and Marks and Kimble never made a formal offer to acquire Baldwin. (Marks Dep. 136; Tr. 127, 949-50.)

Hendricks' MBO

Hendricks declined to participate in an MBO with Marks and Kimble and with Pavia. (Tr. 421, 423, 431; Marks Dep. 33-34, 70-71.) She, however, briefly considered an MBO of her own in early 1999. (Tr. 666-67.) After discussing the possibility with her husband, she decided to pursue her retirement plan instead.[4] (Id.) She never found a financing source, hired a lawyer or make a proposal regarding an MBO. (Id.) Finally, Board members Connell, Howe and Castrucci confirmed that Hendricks advised the Board that she was not interested in an MBO and that she planned to retire in 2001. (Tr. 408; Howe Dep. 98, 112; Castrucci Dep. 117.)

**Strategic Results**

In 1997, Baldwin sold its inventory of pianos. (UF 29.) Baldwin had previously delivered pianos to dealers on a consignment basis. (Id.) The consignment practice was discontinued. (Id.)

---

[4]When Baldwin hired Hendricks in late 1994, her stated goal was to work at Baldwin for six or seven years. (Tr. 266-67.)

-23-

Hendricks expected that elimination of the consignment program would lower Baldwin's debt by $25 million by the end of 1997. (Tr. 298.) Baldwin's debt was reduced a total of $6 million during 1997. (Tr. 301.) However, Hendricks testified that other things were increasing debt such that the net effect was that the overall debt was not decreased by $25 million. (Tr. 530.) Without considering the elimination of the consignment program, Baldwin's overall financial result for 1997 were about the same as the 1996 results. (Tr. 531.)

The results for 1998 were not good either. (Tr. 601.) By December of 1998, the Board wanted to consider other strategic alternatives. (Id.) This is when the Board turned to Lehman Brothers for the confidential offering and memorandum. (Tr. 602.)

By around mid-1999, the Board had decided to sell non-core divisions KAC and CE and to attempt to turn around Music, Baldwin's music business. (Tr. 1055; Castrucci Dep. 158.) Baldwin then embarked on "a concerted effort to improve the manufacturing operations in Greenwood and the other plants and steps were taken to streamline" those operations.[5] (Head Dep. 56; JX 41.) At this time, the Board "still had sufficient confidence in [Hendricks] to continue to lead the Company through the difficult times." (Head Dep. 81.)

Lehman Brothers subsequently prepared a Descriptive Profile of KAC which valued KAC at between $18 million and $26 million. (DX 183; Tr. 1040.)  On March 31, 2000, Baldwin sold KAC to Deutsche Financial Services for $35 million. (UF 36.) At this point, Baldwin had also completed the sale of its Juarez, Mexico property for $7.2 million. (UF 35.)

---

[5]By the end of 1996, Hendricks had already taken steps to begin quality control improvements in piano manufacturing and to implement "synchronous manufacturing." (UF 22.) Prior to this time, Baldwin was using the "batch" manufacturing process. (Id. 22.) "Synchronous manufacturing" is generally more cost efficient. (Id. 23)

At the end of 1999, Cadwalader, with Hendricks' assistance, began studying bankruptcy as an option. (Tr. 717-21.) Board members do not recall being told about studying bankruptcy in 1999 but do recall discussing bankruptcy in 2000. (Head Dep. 72-73; Castrucci 167-70.)

Hendricks presented a budget plan to the Board for the year 2000 that focused on quality, communications and growing the digital and grand segments of the piano business and maintaining capital spending at current levels. (Tr. 735-36.) Hendricks presented a budget plan to the Board for the year 2001 that the Greenwood facility would be closed and some piano manufacturing would be outsourced. (Tr. 734.)

In January of 2001, Lehman Brothers recommended that CE be sold and provided a fairness Opinion to the Board concerning the possible sale. (Wolitzer Dep. 20-21, DX 183.) On January 31, 2001, Baldwin completed the sale of CE for $9.7 million. (UF 37.)

### Bankruptcy

Four months later, on May 31, 2001, Baldwin filed for protection under Chapter 11 of the United States Bankruptcy Code. (UF 39.) Hendricks had resigned from the Board on May 10, 2001. (UF 38.) The asset sale left a deficiency owed to Baldwin's senior secured creditor of approximately $9-11 million. (Tr. 162.) On October 16, 2001, General Electric Capital Corporation paid $17 million to purchase the remaining assets of Baldwin at a court supervised liquidation. (UF 40.)

### Financial Results

Following are the reported financial results for Baldwin (in dollars):

|             | Net Sales   | Net Earnings (Loss) | Net Earnings (Loss) per share |
|-------------|-------------|---------------------|-------------------------------|
| fiscal 1994 | 122,346,000 | 345,000             | 0.10                          |

| | | | |
|---|---|---|---|
| fiscal 1995 | 122,634,000 | 3,960,000 | 1.16 |
| fiscal 1996 | 115,070,000 | 2,056,000 | 0.60 |
| fiscal 1997 | 143,101,000 | 4,449,000 | 1.30 |
| fiscal 1998 | 134,290,000 | 737,000 | 0.21 |
| fiscal 1999 | 124,289,000 | (7,743,000) | (2.24) |
| fiscal 2000 | 128,980,000 | (10,317,000) | (2.98) |
| 1st qtr fiscal 2001 | 15,637,000 | (4,793,000) | (1.38) |

(UF 41-48.)

## RELEVANT LEGAL PROVISIONS

Baldwin was incorporated in Delaware. Thus, Delaware law applies, and the Parties do not argue otherwise.

Directors of a Delaware corporation owe fiduciary duties of care and loyalty. *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 745 (Del. Ch. 2005). The duty to act in good faith is a subset of the duty of loyalty.[6] *Id.* at 745. Finally, corporate officers of Delaware corporations owe fiduciary duties of care and loyalty that are the same as the fiduciary duties of care and loyalty owed by directors. *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009); *In re Tower Air, Inc.*, 416 F.3d 229, 238 n.12 (3d Cir. 2005).

<u>The Duty of Care</u>

---

[6]The duty of disclosure is not an independent duty but the application in a specific context of the duties of care, loyalty and good faith. *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). The duty of disclosure arises when stockholder action is sought or required. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999).

The duty of care requires that directors and officers of a Delaware corporation "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available" when making business decisions. *In re Walt Disney*, 907 A.2d at 749. There are two contexts in which liability arises for a breach of the duty of care. First, liability for a breach of the duty of care may "follow from a board decision that results in a loss because that decision was ill advised or negligent." *Id*. Second, liability for a breach of the duty of care may arise from an "unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." *Id.*(citing *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996)).

Whether a board properly exercised its duty of care regarding a board action is determined by assessing whether the process employed was either rational or employed in a good faith effort to advance corporate interests and is not determined by assessing the actual decision itself. *Id.* at 750. A breach of the duty of care regarding a failure to act requires a showing of a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight." *Id.*(quoting *Caremark*, 698 A.2d at 971).

<u>The Duty of Loyalty</u>

The duty of loyalty requires that a director or officer "protect the interests of the corporation committed to his charge" and "refrain from doing anything that would injure the corporation or deprive the corporation of profit or advantage which [the director's or officer's] skill and ability might properly bring to [the corporation]." *In re Walt Disney*, 907 A.2d at 751(citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)). In sum, there must be no conflict between duty and self-interest. *Id.*

The duty of loyalty "mandates that the best interest of the corporation and its shareholders take[] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Walt Disney*, 907 A.2d at 751(quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). For example, the duty of loyalty is implicated when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders. *Id.*(citing *Cede*, 634 A.2d at 362). There is no "safe harbor" when directors or officers of a Delaware Corporation are on both sides of a transaction. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

The requirement for loyalty is not limited to financial conflicts of interest. *Cede*, 634 A.2d at 362. A conflict of interest may exist where a director or officer receives a personal benefit from a transaction not received by the shareholders generally. *Id.* A personal benefit may include the satisfaction and desire to be a corporate CEO, a sense of pride or a refusal to admit failure. *Venhill Limited Partnership v. Hillman*, No. 1866-VCS, 2008 WL 2270488 at *30 (Del. Ch. June 3, 2008).

Delaware courts have recognized that, "a director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders." *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002). However, the weight given to the director's interest varies with the substantiality of the director's holdings. *Id.*

A director or officer lacks independence or is an interested person when there is evidence of entrenchment, self-dealing or financial interest. *Benihana of Tokyo, Inc. V. Benihana, Inc.*,

891 A.2d 150, 175 (Del. Ch. 2005). However, Delaware law routinely rejects the notion that a

director's or officer's interest in maintaining his or her office, by itself, indicates entrenchment.

*Id.* Further, the fact that directors receive fees does not establish an entrenchment motive. *Id.*

Other entrenchment motive or action must be shown, such as financial dependence, to prove a

lack of independence. *Id.*

      For example, a claim that director defendants had a disqualifying self interest because

they were financially motivated to maintain the status quo must be viewed with caution because

a board decision to reject a merger could always allow a plaintiff to assert an entrenchment

motive. *Gantler*, 965 A.2d at 707. Further, a board can appropriately rely upon its CEO to

conduct negotiations and the involvement of an investment banker is not necessarily required. *In

re The MONY Group Inc. Shareholder Litigation*, 852 A.2d 9, 20 (Del. Ch. 2004). This is

particularly true where the Board demonstrated its independence by deciding to sell the company

and actively supervised the CEO's negotiations, and the CEO acted diligently in those

negotiations. *Id*. However, where the CEO does not respond to a due diligence request from a

prospective buyer due to the CEO's personal financial interest, the CEO is disloyal. *Gantler*, 965

A.2d at 707. In addition, the duty of loyalty is violated when a controlling stockholder purposely

denies a board the right to consider a strategic opportunity fairly and responsibly, misleads

fellow directors, improperly uses confidential information to further his personal interests and

attempts to directly influence a potential buyer. *Hollinger International, Inc. v. Black*, 844 A.2d

1022, 1061-62 (Del. Ch. 2004).

<u>The Duty of Good Faith</u>

-29-

The duty of good faith, a subset of the duty of loyalty, requires an "honesty of purpose," and a "genuine care" for the fiduciary's constituents. *In re Walt Disney*, 907 A.2d at 753. To act in good faith, a director must act in the best interests and welfare of the corporation. *Id.* at 755.

In the corporate fiduciary context, defining bad faith is easier than defining good faith because "Delaware law presumes that directors act in good faith when making business judgments." *Id.* Bad faith is defined as authorizing a transaction "for some purpose other than a genuine attempt to advance corporate welfare or [when the transaction] is known to constitute a violation of applicable positive law." *Id.*(citing *Gagliardi v. TriFoods International, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996)). Said another way, an action taken with the intent to harm the corporation is a disloyal act in bad faith. *Id.*

Acting in bad faith may be shown "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the fact of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney*, 907 A.2d at 755. A fiduciary also acts in bad faith when the fiduciary demonstrates a conscious disregard for the fiduciary's responsibilities. *Id*. Thus, deliberate indifference and inaction in the face of a duty to act is bad-faith conduct. *Id.* For example, bad faith is shown when a fiduciary steers a much-needed source of funds away from a company. *Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161, 1173 (Del. Ch. 1999).

<u>Review Standards</u>

When actions by a board of directors or a corporate officer are challenged, generally one of three standards of judicial review is applied. *Emerald Partners v. Berlin*, 787 A.2d 85, 89

(Del. 2001). The three standards of review are: the business judgment rule; an intermediate standard of enhanced judicial scrutiny; and the entire fairness standard of review. *Id.*

The business judgment rule creates a presumption that a director acts in good faith. *In re Walt Disney*, 907 A.2d at 755. To overcome the business judgment rule presumption, a plaintiff must prove an act of bad faith by a preponderance of the evidence. *Id.*

The business judgment rule generally applies but if it is successfully rebutted, the burden shifts to the defendant directors to prove that the challenged transaction was "entirely fair" to the shareholders. *Emerald*, 787 A.2d at 91. The intermediate standard of enhanced judicial scrutiny is not often used or referred to in the caselaw.

When directors or officers are on both sides of a transaction, the duty of loyalty is implicated and the "entire fairness" standard of review applies. *Weinberger*, 457 A.2d at 710. The director or officer has the burden of establishing the entire fairness of the transaction. *Id.*

Unlike duty-of-loyalty violations, duty-of-care violations are only actionable if the directors or applicable officers act with gross negligence. *In re Walt Disney*, 907 A.2d at 750(citing *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. Super. Ct. 2000). Gross negligence is, in the duty-of-care context, is a "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Id.*(citing *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607 at * 12 ( Del. Ch. Apr. 5, 1990)).

### Business Judgment Rule

The "business judgment rule" protects and promotes the role of the board of directors as the ultimate manage of the corporation. *In re Walt Disney*, 907 A.2d at 746. It operates to

preclude a court from imposing itself unreasonably on the business and affairs of a corporation. *Id.*

The "business judgment rule" is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the bests interests of the company. *Gantler*, 965 A.2d at 705-06(citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *rev'd on other grounds by Brehm*, 746 A.2d 244). This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors. *In re Walt Disney*, 907 A.2d at 747(quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *rev'd on other grounds by Brehm*, 746 A.2d 244). However, when it is shown that a board action is not the product of an informed, disinterested, and independent board, the business-judgment-rule presumption is overcome and the decision is reviewed under the "entire fairness" standard. *Mills Acquisition Co. V. Macmillian*, 559 A.2d 1261, 1279 (Del. 1989).

The decision to remove an officer is a business judgment to which the business judgment rule applies. *Carlson v. Hallinan*, 925 A.2d 506, 540 (Del. Ch. 2006). The business judgment rule applies absent gross negligence or proof that the action was not taken in an honest attempt to foster the corporation's welfare. *Id.*

Plaintiffs have the burden of rebutting the business-judgment-rule presumption by a preponderance of the evidence. *In re Walt Disney*, 907 A.2d at 755; *Gantler*, 965 A.2d at 706. To rebut this presumption, the plaintiffs must show that, in making the challenged decision, the board of directors breached either its duty of loyalty, or the subset duty of good faith, or its duty of care. *Id.*(citing *Emerald*, 726 A.2d at 1221).

-32-

The "business judgment rule" does not apply to director inaction. *In re Walt Disney*, 907 A.2d at 748. The appropriate standard for determining liability for director inaction is generally gross negligence. *Id.*(citing *Aronson*, 473 A.2d at 813).

The actions of each individual director are examined for a breach of the duties of loyalty or care. *In re Walt Disney*, 907 A.2d at 747. The business-judgment-rule presumption may be rebutted by showing that no reasonable business person could possibly authorize the action in good faith, by establishing that a decision was the product of an irrational process or by showing that directors failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's legal compliance and business performance. *In re Tower Air*, 416 F.3d at 238(citing *Caremark*, 698 A.2d at 967-70). The standard for determining whether a business judgment reached by a board was an informed one is, as with inaction, gross negligence. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985), *overruled on other grounds by Gantler*, 965 A.2d 695 (Del. 2009).

However, rebuttal of the business-judgment-rule presumption does not create per se liability on the part of the directors. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). If the presumption is rebutted, the burden shifts to the director or officer defendants to demonstrate that the challenged transaction was "entirely fair" to the corporation and the corporation's shareholders. *In re Walt Disney*, 907 A2d at 747.

### Entire Fairness

To demonstrate entire fairness, the board must present evidence of the cumulative manner by which it discharged all of its fiduciary duties. *Emerald*, 787 A.2d at 97(citing *Cinerama*, 663 A.2d at 1163). The court must then consider how the board discharged all of its

fiduciary duties with regard to fair dealing and fair price. *Id.*(citing *Cinerama*, 663 A.2d at 1172). When deciding whether a transaction was entirely fair, rather than focusing on one component, all aspects of the transaction are to be considered. *Id.* For example, entire fairness is lacking where there is misinformation leading to the absence of meaningful negotiations, board members are materially misled by a CEO, and there is a lack of disclosure on the part of the CEO. *Bomarko*, 794 A.2d at 1182. However, arm's length negotiations and the independence of the bargaining parties are both strong indications of fairness. *Cinerama*, 663 A.2d at 1172-73.

"Fair dealing" involves questions of when the transaction was timed, how it was initiated, how it was structured, how it was negotiated, how it was disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. *Bomarko*, 794 A.2d at 1180."Fair price" involves the economic and financial considerations of the proposed merger including the assets, the market value, the earnings, future prospects and other elements that affect the intrinsic or inherent value of a company's stock. *Id.*

Part of fair dealing is the duty of candor. *Weinberger*, 457 A.2d at 711. The duty of candor prevents a director with superior knowledge from misleading a shareholder by using corporate information to which the shareholder is not privy. *Id.* The duty of candor also requires a corporate fiduciary to disclose all material information relevant to a corporate decision from which they may derive a personal benefit. *Bomarko*, 794 A.2d at 1180. For example, where an officer or director violated the duty of loyalty by obstructing a potential strategic alternative from taking its natural course, the officer or director must prove that the strategic opportunity never would have occurred had the officer or director not breached fiduciary duties. *Id.* At 1179.

Perceived Threats and Hostile Takeovers

-34-

Enhanced judicial scrutiny under the *Unocal* case applies when a board of directors takes defensive measures[7] in response to a perceived threat to corporate policy and effectiveness which touches on issues of control. *Gantler*, 965 A.2d at 705. Enhanced judicial scrutiny also applies when directors oppose a hostile takeover. *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987). This is because, when directors oppose a hostile takeover, a possibility arises that a board may be acting primarily in its own interests, rather than in the interests of the company and its shareholders and a different standard of review applies. *Id.*

When *Unocal* applies, the directors have the burden of proving that they have not acted solely or primarily out of a desire to perpetuate themselves in office, that the threatened takeover posed a danger to corporate policy and effectiveness and that the defensive measures adopted are reasonable in relation to the threat posed. *Id.* These prerequisites are proven by showing good faith and reasonable investigation. *Id.* If the prerequisites are shown, the business judgment rule applies. *Id.*

<u>Damages</u>

The Court has a significant amount of discretion in fashioning a remedy for a breach of fiduciary duty. *Bomarko*, 794 A.2d at 1184. Any appropriate form of equitable and monetary relief may be awarded. *Id.* However, where issues of loyalty are involved, potentially harsher rules come into play. *International Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000). Delaware law imposes strict penalties to discourage disloyalty. *Id.*

---

[7]Rejecting an acquisition offer, without more, is not defensive action for purposes of the application of *Unocal*. *Gantler*, 965 A.2d at n.23.

When the plaintiff fails to rebut the presumption of the "business judgment rule," the plaintiff is not entitled to any remedy unless the transaction constitutes waste. *In re Walt Disney*, 907 A.2d at 747(citing *In re J.P. Stevens & Co., Inc. Shareholders Litigation*, 542 A.2d 770, 780 (Del. Ch. 1988)). Waste is rare and involves "an unconscionable case where directors irrationally squander or give away corporate assets." *Id.* at 749(citing *Brehm*, 746 A.2d at 263). Committing waste is an act of bad faith but not every act of bad faith constitutes waste. *Id.*

Certainty in the award of damages is not required where a wrong has been proven and injury established. *Bomarko*, 794 A.2d at 1184. Responsible estimates that lack mathematical certainty are permitted so long as the Court has a basis to make a responsible estimate of the damages. *Id.* However, a court may not award damages based upon "speculation or conjecture" where the plaintiff has not met its burden of proof on damages. *Acierno v. Goldstein*, No. 20056-NC, 2005 Del. Ch. LEXIS 176 at *31-32 (Del. Ch. Nov. 16, 2005).

A specific and quantified injury that has resulted from a breach of fiduciary duty need not be proven. *Cede*, 634 A.2d at 369. For example, if a merger is not entirely fair, a court may, under Delaware law, include rescissory damages into its determination of fair price if such elements are susceptible to proof and appropriate under the circumstances. *Id.* at 1177. Further, deepening insolvency is a valid measure of damages for breach of a fiduciary duty. *In re The Brown Schools*, 386 B.R. 37, 48 (Bankr. D. Del. 2008). Courts have also considered the changes in a company's value from the time of a breach of fiduciary duties to be damages. *International Telecharge*, 766 A.2d at 440.

A plaintiff is entitled to per se nominal damages for a breach of the duty of disclosure. *O'Reilly*, 745 A.2d at 917. So long as the breach of the duty of disclosure arising from a false

statement, omission or partial disclosure, a plaintiff may request nominal damages without showing causation or actual quantifiable damages. *Id.* However, if more than nominal damages is requested, the plaintiff will have to prove causation and identify actual quantifiable damages. *Id.*

## ANALYSIS

The Unsecured Creditors, who at least initially, have the burden of proof, argue that Hendricks violated fiduciary duties of care and loyalty as an Officer and Director of Baldwin. As a result, according to the Unsecured Creditors, Hendricks is liable for damages measured by the loss in corporate enterprise value of at least $30 million.

Officers and directors of Delaware companies owe duties of loyalty and care to the company. A duty to act in good faith is a subset of the duty of loyalty.

The duty of care requires that directors and officers use that amount of care which ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available when making business decisions. Liability for breach of the duty of care generally arises from a board decision that results in a loss or from an unconsidered failure of the board to act in circumstances in which due attention would have prevented a loss. Whether a board properly exercised its duty of care is determined by assessing whether the process used was rational or employed in good faith and is not determined by assessing the success or failure of the actual decision. Further, an assessment of a failure to act entails an assessment of whether a lack of good faith is shown as evidenced by sustained failure of a director to exercise reasonable oversight.

The duty of loyalty requires that a director or officer protect the interests of the corporation and not do anything that would injure the corporation or deprive the corporation of profit or advantage which the director's or officer's skill and ability might properly bring to the corporation. It requires that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director or officer and not shared by the shareholders generally. In sum, a director or officer must have no conflict between duty and self-interest.

A director or officer lacks independence when there is evidence of entrenchment, self-dealing or financial interest. However, a director or officer does not lack independence due only to an interest in maintaining his or her office and a director does not lack independence due only to receiving fees for being a director.

The duty of loyalty is implicated when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders. Further, the requirement for loyalty is not limited to financial conflicts of interest. A non-financial benefit may include the satisfaction and desire to be a corporate CEO, a sense of pride or a refusal to admit failure.

The duty of good faith, a subset of the duty of loyalty, requires an "honesty of purpose," and a "genuine care" for the fiduciary's constituents. Good faith is generally defined in terms of the lack thereof or a demonstration of bad faith. Bad faith is defined as authorizing a transaction for some purpose other than a genuine attempt to advance corporate welfare or when the transaction is known to constitute a violation of applicable positive law. Thus, an action taken with the intent to harm the corporation is a disloyal act in bad faith. Also, deliberate indifference and inaction in the face of a duty to act is bad-faith conduct.

-38-

Having described the applicable fiduciary duties, the analysis turns to the implications of a breach of the duties. If the duties are not breached, the business judgment rule applies.

The business judgement rule is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company. The business judgment rule precludes a court from imposing itself unreasonably on the business and affairs of a company.

If a plaintiff shows by a preponderance of the evidence that one or more of the fiduciary duties is breached, the business judgment rule (presumption) is set aside and a court applies the "entire fairness standard" to the challenged action. When the entire fairness standard is applied, the burden shifts to the directors to present evidence of the cumulative manner in which it discharged all of its fiduciary duties. If the transaction at issue was not entirely fair, damages may be awarded.

In this case, the Unsecured Creditors argue that Hendricks breached her fiduciary duties and the entire fairness standard should be used to judge her actions. They further argue that, since her actions were not entirely fair, they are entitled to damages. So, the first question to be decided is whether Hendricks breached her fiduciary duties.

The Unsecured Creditors identify fourteen (14) alleged breaches. Each will be addressed seriatim.

**1. Hendricks did not tell the Board that, after three years on the job, she did not believe the core assumption of her business plan that Baldwin could be sufficiently grown and that she thought the only other alternative was to sell Baldwin.**

Although not specifically referenced by the Unsecured Creditors, they are apparently referring to a statement in a letter written by Hendricks on December 30, 1997, to Bill Berkley in

an attempt to attract him to become a Board member. (Tr. 312-18.) In this letter, Hendricks said, in part,

> Baldwin is at a crossroads. So far, I'm pleased with our progress in fixing our broken business. But, the solutions of the past are not usually the solutions of the future. This fix will give us more predictable earnings in the next several years, but will not address some of the most basic issues Baldwin faces… stock illiquidity; concentrated ownership among six individuals or institutions; and an insufficient base (size; mass) to attract new investors.
>
> We have two choices: sell the company or grow it at a much faster rate than we have historically done. I want to pursue the latter, but need a partner or two experienced in merger and acquisitions and corporate finance to help me. I do not believe we can grow fast enough just through internal growth. While I could hire M & A consultants or managers, I need board support  for such a growth strategy and do not have it now.

(PX 21.)

At trial, Hendricks admitted that she did not believe, at the time, her statement in the letter that Baldwin could be grown fast enough just through internal growth. (Tr. 312-18.) The Unsecured Creditors now argue that she breached a fiduciary duty by not communicating this belief to the Board.

First, the Unsecured Creditors do not identify specifically which fiduciary duty they believe Hendricks violated in this instance. The duty of care is not implicated because this is not evidence that Hendricks did not use ordinary care and consider all material information reasonably available. Further, breach of the duty of care requires a showing of gross negligence and, even if this instance were to be found negligent, which is not the case, it could hardly be said to be grossly negligent. The duty of loyalty is not implicated because this is not evidence that Hendricks did not protect the interests of Baldwin and that she did anything that would injure Baldwin.

Second, there is no evidence that Hendricks did not communicate this thought to the Board. In fact, there is evidence that Baldwin had an accounting and forecasting system in place the results of which were shared with the Board by Hendricks. Presumably, the assertion that Baldwin's strategic plan could not be achieved by internal growth alone was there for all to see. Also, apparently the rest of the Board reached the conclusion, somehow, that Baldwin could not grow fast enough through internal growth soon after Hendricks did because, near the end of 1998, the Board had hired M & A consultants and was considering all strategic alternatives including a possible sale of Baldwin.

The Unsecured Creditors have not identified specifically which, if any, fiduciary duty they believe Hendricks violated in this instance. They also have not shown that Hendricks did not tell the Board, after three years on the job, that she did not believe that Baldwin could be sufficiently grown and the only alternative was to sell Baldwin. Thus, this allegation is not a breach of fiduciary duty.

**2. Hendricks acted in self-interest when she did not tell the Board, while she was in a position to influence the Board process, the she would lose her job as CEO if A440 acquired Baldwin.**

Marks envisioned that the new company, A440, would be managed by he, Kimble and Hendricks. He testified that, when told this, Hendricks expressed concern that she would no longer be CEO of the new Company. Hendricks confirmed that she was told by Marks that if A440 was successful, she would no longer be CEO of Baldwin but she does not recall expressing concern about such a possibility. (Tr. 607.)

First, the Unsecured Creditors have identified no testimony, other than from Marks' deposition, that Hendricks was concerned that she would lose her job as CEO. The

uncorroborated part of Marks' testimony regarding what Hendricks said is questionable at best considering that he was terminated for insubbordination by Hendricks before his deposition was taken.

Second, even if true, Hendricks' concern regarding the CEO position or a failure to tell the Board thereof does not, alone, indicate a breach of fiduciary duty. It does not indicate a breach of fiduciary duty because she stood to profit an amount in the $1 to $2 million range from a sale of Baldwin due to her ownership of Baldwin stock. It does not indicate a breach of fiduciary duty because Hendricks had announced to all that she intended to retire in 2000 or 2001 and Project A440 was initiated in 1999 and would most probably not have come to fruition until either shortly before or after Hendricks' retirement. Finally, the desire of officers and directors to remain in office is an interest that "may be attributed universally to boards of directors and officers of corporations and is not a basis for a claim of conflict of interest with the interests of the corporation," *Falkenberg v. Baldwin*, 1997 U.S. Dist. LEXIS 15456 at *5 (S.D.N.Y. June 13, 1997), and a director or officer who is also a shareholder is more likely to have interests that are aligned with the other shareholders of that corporation. *See Orman*, 794 A.2d at 27n.56. Hendricks had no motive, economic or otherwise, to oppose Project A440.

Thus, the Unsecured Creditors have not shown that Hendricks was concerned and did not tell the Board that she would lose her job as CEO if A440 acquired Baldwin. Further, even if she would lose her job as President if A440 acquired Baldwin, failure to tell this to the Board is not a breach of fiduciary duty.

**3. Hendricks acted in self-interest when she misled and withheld from the Board the information that she was exploring whether to lead a competing MBO.**

In fact, Hendricks did briefly consider whether to undertake an MBO and, after this consideration, informed the Board that she was not interested in an MBO. Hendricks, however, did not seek a source of financing, did not hire an attorney and did not prepare or make a proposal.

The assertion that Hendricks misled and withheld her consideration of an MBO from the Board can hardly rise to the level of a breach of fiduciary duty since she considered an MBO for only a short period of time and since it is undisputed that she told the Board that she was not interested in an MBO and the Board could easily and rightfully assume that Hendricks considered the matter before she told them the result.

**4. Hendricks knowingly ignored instructions from the Board and legal counsel that all substantive contact with A440 should be solely through Lehman Brothers and instead told A440 to communicate solely through her.**

Marks testified that starting when he and Kimble gave their A440 proposal to Hendricks that she insisted at the time that everything go through her. Hendricks confirms that the Board wanted her to be the interface between Project A440 and the Board and this was no different than any other potential financial sponsors.

However, this "only interface" did not last very long. The letter from Marks and Kimble indicating an interest in an MBO was delivered to Hendricks on March 19, 2009. On March 20th, the Board met via telephone to discuss the implications of the letter. At that time, Lehman Brothers summarized their views of the impact that Project A440 might have on other possible sponsors and concluded that competitive bidders must know Marks' and Kimble's position and interest. The Board then determined that Larose would speak with Marks and Kimble to ascertain the extent of their interest.

-43-

The Board wanted Project A440 to be vetted through Lehman Brothers. Lehman Brothers prepared and Marks and Kimble signed a confidentiality agreement that, among other things, provides that communications regarding Project A440 should be only through Lehman Brothers.

Lehman Brothers preferred to contact financial sponsors. Thus, Marks and Kimble were required to advise Lehman Brothers of the status of their discussions with proposed financial sponsors. However, Marks and Kimble wanted to have more control over the process. Marks testified that he was not looking for Lehman Brothers to provide information to him but was looking for Lehman Brothers to provide information to Baldwin, which they did.

It was Lehman Brothers that discussed the substance of Project A440 with the Board. It would be "unprecedented" for Lehman Brothers to present such information to the Board without speaking to the proponents of Project A440.

Thus, it is clear that Hendricks' admonition that all communications from Marks and Kimble regarding Project A440 should go through her was not only at the request of the Board but was short-lived. Also, Hendricks placed no impediments to communications from the Board to Marks and Kimble nor did she interfere with Marks' and Kimble's relationship with their proposed equity sponsor.

Marks was not interested in information from Lehman Brothers. He and Kimble already had access to Baldwin's financial information due to their positions at Baldwin. Kimble does not remember having much interaction with Hendricks regarding Project A440 nor does he remember her discouraging them either.

Thus, while Hendricks may initially have told Marks and Kimble that all communications regarding Project A440 were to go through her, this quickly changed with the Board's approval.

-44-

Further, the Board was well aware of Project A440 and Project A440 was not hindered by the lack of information. The Unsecured Creditors have not shown that Hendricks violated a fiduciary duty by initially insisting that all communications to the Board regarding Project A440 go only through her.

**5. Hendricks acted in self-interest when she withheld material information regarding the specifics of A440's proposal from the Board.**

Hendricks immediately shared the A440 offer letter, prepared by Marks and Kimble, with the Board. Lehman Brothers then, at the request of the Board, vetted the A440 proposal and presented the results, along with the other possible suitors, to the Board. There is no evidence of any material information that the Board did not have and there is no evidence that Hendricks did not follow Board instructions regarding the A440 proposal. Therefore, the Unsecured Creditors have not shown that Hendricks violated a fiduciary duty by withholding material information regarding the A440 proposal from the Board.

**6. Hendricks acted in self-interest when she halted the Board's process to look for a buyer while she explored leading an MBO and awaited the outcome of the Brunswick negotiation.**

The Board's process to look for a buyer was not halted for any material length of time while the negotiations with Brunswick continued. Hendricks and several Board members thought that a strategic alliance with Brunswick would be helpful to Baldwin. The Board unanimously agreed to stop Project Ludwig, the exploration of strategic alternatives, until a deal with Brunswick was consummated. Lehman Brothers responded with a recommendation that Project Ludwig continue albeit at a slower pace. With this, the Board agreed. Thus, it was a unanimous Board that halted Project Ludwig for a short period of time and not Hendricks acting alone.

Further, there is no evidence that Hendricks halted Project Ludwig so that she could explore an MBO. In fact, the evidence was that Hendricks only briefly considered an MBO and then informed the Board that she was not interested and that Project Ludwig was halted, if at all, only for a short time and with approval by the entire Board.

Therefore, the Unsecured Creditors have not shown that Hendricks breached a fiduciary duty regarding the halting of Project Ludwig. If Project Ludwig was halted at all, it was halted by a unanimous, fully-informed Board while negotiations with Brunswick continued. Further, there is no evidence that Project Ludwig was halted while Hendricks considered an MBO.

**7. Hendricks acted in self-interest when she withheld from the Board the material facts of her relationship with Stuart Seigel and Arnold & Porter and about the purported reasons that she asked the Board for permission to hire Arnold & Porter.**

Hendricks contacted Seigel at Arnold and Porter in January of 1999 regarding her Employment Agreement and Change of Control Agreement. None of the Board members remember that Hendricks specifically informed them of her contact with Seigel but they do remember that Hendricks would have discussed her employment agreement with someone at Arnold and Porter. Seigel acknowledges the contact but has no memory of giving any specific advice.

In April of 1999, the Board approved the hiring of Seigel to advise Hendricks in her role as Chairman. Seigel testified that Baldwin, and not Hendricks, was his client. Seigel confirmed that his assignment was to assist Baldwin and Hendricks, in her role as Chairman, in resolving Baldwin's financial difficulties.

Thus, the Board was aware that Hendricks was using someone at Arnold and Porter regarding her employment agreement(s) and subsequently decided to hire Seigel at Arnold and

-46-

Porter to advise Hendricks in her role as Chairman. While there is no specific evidence that Hendricks informed the Board about her use of Seigel at Arnold and Porter, there is evidence that the Board was well aware of this use and elected to employ Arnold and Porter to obtain further advise and counsel. Therefore, the Unsecured Creditors have not shown that Hendricks breached a fiduciary duty by withholding material information from the Board regarding her initial use of Seigel at Arnold and Porter when the Board decided to hire Arnold and Porter for further advise and counsel.

**8. Hendricks acted in self-interest when she did not tell the Board that she was using confidential board evaluation data for the personal purpose of exploring an MBO.**

Hendricks was the President of Baldwin and on Baldwin's Board. Thus, she certainly had access to the Board's evaluation of Baldwin and the evaluation presented by Lehman Brothers. Further, the Board had to be well aware that she had access to this information.

Presumably, Hendricks was aware of this information when she briefly studied an MBO, elected to not pursue an MBO and informed the Board thereof. However, this cannot rise to the level of a breach of fiduciary duty because there was no transaction for Hendricks to appear on both sides of and because Hendricks did not receive a personal benefit in terms of a financial interest in Baldwin that was not shared by all shareholders.

**9. Hendricks acted in self-interest by obstructing A440's efforts to buy Baldwin by misleading A440 about the status of the Board's consideration of its proposal and by repeated actions intended to keep A440 inactive while considering other potential buyers who had not indicated that Hendricks would lose her job.**

There is no evidence that Hendricks acted to obstruct A440's efforts to buy Baldwin. Marks and Kimble were in positions at Baldwin to obtain the Baldwin performance data that they needed. They identified no information that they needed and did not receive. Further, the

-47-

Board, through Project Ludwig, was well aware of Marks' and Kimble's offer and the status thereof. Marks and Kimble were considered potential buyers by the Board.

As for Hendricks status, while, as the Unsecured Creditors argue, other potential buyers had not indicated that Hendricks would lose her job, they also had not indicated that Hendricks would not lose her job. They were silent.

Further, there is no credible evidence that Hendricks even cared about whether she would be the CEO of a new Baldwin.  There is credible evidence, however, that she had already announced her plans to retire in 2000 or 2001 and that she stood to profit an amount in the $1 to $2 million range from a sale of Baldwin due to her ownership of Baldwin stock.

Thus, the Unsecured Creditors have not shown that Hendricks breached a fiduciary duty by misleading A440 about the status of the Board's consideration of its proposal and by intending to keep A440 inactive while considering other potential buyers who had not indicated that she would lose her job. There is no evidence that Hendricks misled Project A440 about its consideration by the Board. Also, there is no credible evidence that Hendricks was concerned about losing her job if Project A440 came to fruition, there is no evidence as to what other potential buyers would do with Hendricks, and there is no evidence that would even amount to a credible reason that Hendricks would be concerned about losing her job.

**10. Hendricks acted in self-interest when she withheld from the Board information that the Bank of Montreal had investigated and was willing to move forward as an equity sponsor of A440 subject to certain conditions.**

There is no evidence that the Bank of Montreal was willing to move forward as an equity sponsor. More specifically, there is no evidence that the preconditions which the Bank of

Montreal identified were ever satisfied. Further, the Board was well aware of A440's status from briefings that they received on Project Ludwig.

The Bank of Montreal never reached the point where it was doing diligence on Baldwin. It was still trying to figure out whether Project A440 was something worth allocating resources to. Thus, there was never a firm financial commitment to Project A440 because it was too soon in the process. The Bank of Montreal was still evaluating its level of interest and had not made a formal proposal to Marks and Gimble. Ultimately Marks and Kimble did not receive a formal financing commitment from any lending institution. Therefore, the Unsecured Creditors have not shown that Hendricks breached a fiduciary duty by withholding material information from the Board regarding Project A440.

**11. Hendricks acted in self-interest when she terminated Marks to keep from the Board the fact that A440 was still actively trying to buy Baldwin, had backing and was waiting for some response from Hendricks and to keep Marks from telling the Board why he believed Hendricks was taking Baldwin "over a cliff."**

After being advised by two Board members to do what she thought was best for Baldwin, Hendricks determined that Marks' conduct was insubordinate and terminated his employment for that reason. Further, there is evidence that Project A440 was being considered as part of Project Ludwig but there is no evidence, as set forth above, that Project A440 ever had the financial support to buy Baldwin. Finally, and particularly after he was terminated, there is no evidence that Marks was prohibited from communicating with the Board or even attempted to communicate with the Board. Therefore, the Unsecured Creditors have not shown that Hendricks breached a fiduciary duty by terminating Marks.

**12. Hendricks acted in self-interest when she withheld from the Board information that Baldwin was a "mess" without Marks and Steve Brock and she did not have the expertise**

**to manage the chosen direction of Baldwin from mid-1999 forward and that she was preparing Baldwin for a bankruptcy filing in the last quarter of 1999.**

Baldwin's forecasts, projections and budgets systems were adequate and Baldwin's forecasts, projections and budgets were shared with the Board by Hendricks and others and were fully discussed by the Board. Thus, the Board had independent information from which it could and did determine for itself the status of Baldwin's operation.

Baldwin's Board implemented several strategic alternatives in response to its assessment of the financial status of Baldwin. One of the consultants hired by Baldwin's Board began, along with Hendricks, to study bankruptcy as a strategic alternative near the end of 1999. The Board members do not recall being told about the bankruptcy study at the end of 1999 but do recall discussing bankruptcy in the year 2000. After continuing to implement other strategic alternatives, on May 31, 2001, Baldwin filed for bankruptcy.

Thus, Hendricks did not withhold relevant information from the Board. The Board was given forecasts, projections and budgets and discussed these items. Further, there is no evidence that it was not prudent to study bankruptcy as one strategic alternative. The Board hired consultants to study, and in some cases implement, strategic alternatives. Bankruptcy was one of the alternatives studied. Therefore, the Unsecured Creditors have not shown that Hendricks breached a fiduciary duty regarding providing relevant information to Baldwin's Board regarding the operation of Baldwin and regarding preparing a bankruptcy filing as a strategic alternative.

**13. Hendricks acted in self-interest by misleading the Board and failing to preserve the value of Baldwin in the midst of the Board's process to find someone to buy Baldwin.**

There is evidence that Baldwin was not financially successful in the end but there is no evidence that Hendricks misled the Board regarding Baldwin's operations or the implementation of strategic alternatives. In fact, the evidence is to the contrary. There is evidence that Baldwin's Board, led by Hendricks, recognized Baldwin's financial problems and attempted to preserve the value of Baldwin by creating and, in some cases, implementing strategic alternatives.

**14. Hendricks failed to act with ordinary care or loyalty by action out of self-interest in misleading the Board and by failing to preserve the value of Baldwin in the midst of the Board's process to find someone to buy the Company.**

The Unsecured Creditors have not shown that Hendricks acted out of self-interest and misled the Board as addressed in several allegations above. Also, as addressed in several allegations above, the Unsecured Creditors have not shown that Hendrick's failed to preserve the value of Baldwin.

## JUDGMENT ON THE CLAIM

The Unsecured Creditors have not sustained their burden of showing that Hendricks violated any of her fiduciary duties. Essentially all of the Unsecured Creditors alleged breaches consist of an arguable fact followed by unsupported allegations of what could have occurred, but did not occur, based upon the arguable fact. Said another way, the Unsecured Creditors' alleged breaches consist mainly of after-the-fact second guessing.

Since Hendricks has not violated any of her fiduciary duties, the business judgment rule is applied. It is presumed that in making business decisions, Hendricks acted on an informed basis, in good faith and in the honest belief that her actions were taken in the best interests of Baldwin. This Court will not unreasonably impose itself any further into the business and affairs of Baldwin.

Judgment is GRANTED to Karen L. Hendricks and AGAINST the Official Committee of Unsecured Creditors on the breach-of-fiduciary-duty claim brought by the Official Committee of Unsecured Creditors against Karen L. Hendricks. Finally, The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Ninth day of September, 2009.

**s/Thomas M. Rose**

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record